## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| CLEARVALUE, INC. | § | |
| and RICHARD ALAN HAASE, | § | |
| | § | |
| *Plaintiffs*, | § | |
| v. | § | Civil Action No. 6:06-cv-197 |
| | § | |
| PEARL RIVER POLYMERS, INC.; | § | Jury |
| POLYCHEMIE INC., SNF INC.; | § | |
| POLYDYNE, INC., | § | |
| and SNF HOLDING COMPANY, | § | |
| | § | |
| *Defendants*. | § | |

### MEMORANDUM OPINION AND ORDER

On March 29, 2007, after three days of trial and an all-day sanctions hearing, the Court struck ClearValue and Richard Haase's (collectively "ClearValue") pleadings and entered judgment for the Defendants and against ClearValue. The Court found that ClearValue and Gordon Waggett, ClearValue's attorney, had engaged in willful, bad faith discovery abuse to the severe prejudice of Defendants (collectively "Pearl River") by failing to produce discoverable tests of an accused Pearl River product. The Court also awarded Defendants attorneys' fees and costs to be determined after appropriate briefing. Now before the Court are Pearl River's Motion for Dismissal of All Claims and for Sanctions (Docket No. 282), ClearValue and Haase's Motion to Reconsider Sanctions and for New Trial (Docket No. 286), and Waggett's Motion for Reconsideration of Sanctions (Docket No. 294).

### BACKGROUND

A. Introduction

Richard Haase is the sole named inventor of U.S. Patent No. 6,120,690 ("the '690 patent")

and founder and CEO of ClearValue.  ClearValue is engaged in the clarification of water and wastewater and its primary customers are municipal water treatment facilities.  *See* Docket No. 1. Both ClearValue and Haase in his individual capacity are plaintiffs in this case.

Haase licensed the '690 patent to ClearValue.  Trial Tr. March 27, 2007 at 170.  ClearValue alleges the '690 patent allegedly teaches a process for clarifying water and wastewater using a "newly formulated" class of "high molecular weight quaternized ammonium polymers" and aluminum polymers.  *See* '690 Pat. col. 1:7-17.  The '690 patent describes these "newly formulated" high molecular weight polymers as having  two important characteristics: a molecular weight of at least one million and a "viscosity greater than about 1,000 cps [centipose seconds] at a concentration of approximately 20% in water."  '690 Pat. col. 3:1-4.  The '690 patent identifies di-allyl di-methyl ammonium chloride ("DADMAC") as a quaternized ammonium polymer.  The '690 patent identifies ammonium chloride ("ACH") as an aluminum polymer.  '690 Pat. col. 2:58-59.  The patent purports to teach that combining a high molecular weight ammonium polymer and an aluminum polymer clarifies water by separating impurities into solid "flocs" that are easily removed from the water.  '690 Pat. col. 1:5-17; col. 3:59-67; col. 4:1-9, 49-54.  The '690 patent also allegedly teaches the addition of other chemicals to the high molecular weight polymer and aluminum polymer blend, such as epichlorohydrin di-methyl amine ("Epi-DMA").

ClearValue claimed to have held the water clarification process technology described in the '690 patent as a trade secret until the '690 patent issued on September 19, 2000 ("the water clarification process trade secrets").  ClearValue also allegedly possessed trade secrets related to creating stable blends of the various polymers described in the '690 patent prior to adding the polymers to wastewater (the "blending technologies" or "blending trade secrets").  *See* Docket No. 178 at 2.  These purported trade secrets included using hydrochloric acid ("HCl") to pH adjust

2

DADMACs and Epi-DMAs, using HCl to quench polymerization reactions in the manufacture of DADMACs and Epi-DMAs, and using sodium persulfate as a catalyst in manufacturing DADMACs. Docket No. 178 at 2. In November 2003, Haase destroyed any trade secret protection that existed for the blending technologies when he disclosed them in U.S. Patent App. No. 10/413, 849 ("the '849 application"), which is a continuation-in-part patent application related to the '690 patent. *See* Pat. App. No. 10/413,849; Trial Tr. March 26, 2007 at 136, 196.

Pearl River is a manufacturer of chemicals including polymers and polymer blends used to clarify water. ClearValue was a Pearl River customer between 1995 and 2002. In September of 2002, Pearl River stopped supplying ClearValue and filed suit against ClearValue in county court alleging non-payment of account.[1] *See* Docket No. 90 Exh. 3. This is when Haase first hired attorney Gordon Waggett to defend ClearValue in Pearl River's county court suit. Waggett was a solo intellectual property lawyer with over 18 years combined patent experience with both a national patent law firm and as in-house counsel dealing with patent issues. Sanctions Hr'g Tr. at 72, 76. Waggett continued to represent ClearValue as its primary patent counsel and was involved in hiring the two litigation teams joining him in representing ClearValue in this suit.

ClearValue filed this lawsuit on January 4, 2005. Docket No. 1. ClearValue alleged that Pearl River infringed the '690 patent, induced others to infringe by selling polymers for use in the water clarification process allegedly taught in the '690 patent, misappropriated both the water clarification process and blending trade secrets, engaged in unfair competition,[2] and breached a confidential relationship with ClearValue. Docket No. 1. ClearValue asserted that it had shared the

---

[1] However, ClearValue continued to obtain Pearl River polymers through intermediary companies. Trial Tr. March 26, 2007 at 144, 152-53.

[2] ClearValue withdrew its unfair competition claim during the second day of trial. Trial Tr. March 27, 2007 at 49.

3

water clarification process technology with Pearl River in 1996 and the blending technologies between 1997 and 1999—pursuant to a verbal confidentiality agreement—in the course of the companies' supplier-customer relationship.  Trial Tr. March 26, 2007 at 146-148; 212-19; 226-231.

One of the central issues in this case—if not the dispositive issue—was whether Pearl River's accused 4620 and 4820 DADMAC products were high molecular weight polymers as described in the '690 patent.[3]  The parties vehemently contested the molecular weight limitation from the outset of the case.  During claim construction, ClearValue argued strongly for a construction of "molecular weight" that defined molecular weight only in terms of viscosity.  *See* Docket No. 89 at 5 (claim construction opinion).  Pearl River argued that the term should be construed according to the dictionary definition of molecular weight: "the sum of the atomic weights of all the atoms in a molecule." *See id.* at 10.  The Court's construction agreed with Pearl River, but clarified that the molecular weight could be determined by viscosity testing or any other accepted method.[4]  *See id*.

At trial, ClearValue presented no evidence of any testing showing the accused products had a molecular weight of one million or greater but relied solely on marketing materials prepared by

---

[3] Whether the accused products had the second characteristic of the "new class" of high molecular weight polymers described in the '690 patent—"viscosity greater than about 1,000 cps at a concentration of approximately 20% in water"—was not highly contested; the "20" in the 4620 and 4820 product designations indicate a 20 percent concentration in water.  '690 Pat. col. 3:1-4.  While Pearl River consistently marked the viscosity properties of these products, Pearl River's sales and marketing documents had conflicting molecular weight information for these products.  At trial, ClearValue relied solely on those Pearl River documents that showed that the accused products were high molecular weight.  The molecular weight limitations of the accused products was hotly contested and was clearly a potentially dispositive issue in the case.

[4] Prior to the claim construction hearing, ClearValue only accused Pearl River's 4800 product series of being an infringing high molecular weight DADMAC under ClearValue's viscosity-driven molecular weight definition.  After the Court issued its *Markman* opinion, ClearValue also asserted that under the Court's construction, Pearl River's 4620 product was also a high molecular weight DADMAC that infringed the '690 patent when used to clarify water in combination with ACH.  ClearValue alleged that the 4620 and 4820 products met the high molecular weight limitation as defined by the Court's *Markman* opinion and were sold primarily for use in water clarification as taught by the '690 patent.

Pearl River and given to its distributors and customers describing the 4620 and 4820 products as having molecular weights greater than one million.  Pearl River countered that these marketing materials had erroneous molecular weights that conflicted with other Pearl River documents and an independent test indicating the products were not "high molecular weight" DADMACs.

When cross-examining ClearValue's testifying expert, James Stoll, on the third day of trial, Pearl River learned that Stoll had reviewed an unproduced  molecular weight test performed on an accused Pearl River product.  That test showed that the product—which Haase testified was an accused product—did not have a high molecular weight.  Sanctions Hr'g Tr. at 142-143; *see also* Trial Tr. March 28 at 211.  The Court ordered ClearValue to produce the testing.  ClearValue subsequently produced two tests: the molecular weight test and a viscosity test.  Pearl River moved for dismissal of all claims and sanctions in light of ClearValue's failure to produce these reports.  Docket No. 282.

B. Timeline

This discovery violation began over a year-and-a-half ago and continued until the third day of trial when it was finally exposed.  Importantly, the withheld tests are relevant to a critical issue in this case.  The following detailed history reveals the true depth and breadth of this misconduct by Haase—both individually and acting for ClearValue—and Waggett.

ClearValue and Haase (collectively "ClearValue") filed this suit against Pearl River in January of 2005.  At the time this suit was filed, Haase controlled ClearValue.  ClearValue had no employees other than Haase and his wife, Haase conducted ClearValue's business out of his home, and ClearValue had no board of directors.  Trial Tr. March 26, 2007 at 142-43; Defs.' Exh. 1008 at 18 (ClearValue Jan 5, 2007 Business Plan).  Haase made all business decisions for ClearValue and conducted all litigation on behalf of ClearValue (e.g., gathering responsive documents for

production).

As previously stated, Waggett's representation of Haase and ClearValue began over two years ago, and at least three months before this case was filed.  *See* Docket No.  90 Exh. 4 (October 29, 2004 ClearValue pleading in county court case submitted by Waggett); Docket No. 1 (original complaint filed Jan. 4, 2005).  Waggett testified that he was not lead counsel in this suit, but that he helped Haase hire a litigation team for this case.[5]  Sanctions Hr'g Tr. at 77.  However, Waggett represented Haase and Clearvalue throughout the entirety of this suit, and Waggett testified that he was ultimately responsible for many of the patent-related motions in this suit.  *Id*. at 79.  Waggett, in fact, is the only attorney who has represented ClearValue for the entirety of this suit.  Waggett therefore fully appreciated the issues in this case from the outset.  Haase was also actively involved in the litigation; Waggett and Haase communicated almost every day.  *Id*. at 83.  Waggett testified that Haase was a "very active client."  *Id*. at 120.  Haase testified that Waggett was his primary contact on the litigation team.  *Id.* at 140.

On April 6, 2005, the Court issued its Discovery Order in this case.  Docket No. 9.  Paragraph three, regarding testifying experts, required each party to disclose, *inter alia*, "all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony."  The Discovery Order clearly extends beyond those materials an expert actually relies upon and encompasses everything a testifying expert has been given or has seen.  Furthermore, paragraph 10

---

[5]  Haase's original litigation team consisted of two attorneys who withdrew from their representation on June 27, 2006, claiming irreconcilable differences with ClearValue and Haase.  Docket No. 87.  Haase and Waggett hired two new litigation counsel  in late August 2006, and a third on the eve of trial in March of 2007.  Docket Nos. 101, 104, 262.  The Court will use the terms "litigation counsel/attorney" or "litigation team" in this opinion to refer to those counsel Waggett and Haase brought in to help with this litigation.  As used in this opinion, these terms do not include Waggett, although Waggett was very involved in the litigation.  There is no indication that any of ClearValue's litigation counsel knew the tests at issue had been improperly withheld from Pearl River.

imposed on each party a "duty to supplement or correct its disclosures *immediately* if the party obtains information on the basis of which it knows that the information disclosed was either *incomplete or incorrect* when made, or is no longer complete or true." Docket No. 9 (emphasis added).

In the fall of 2005, Haase first met Stoll to consider hiring Stoll as an expert for claim construction. Stoll was designated as a testifying expert for claim construction on September 30, 2005. Docket No. 38. This was Stoll's first case as a testifying expert. Haase was also designated to testify on claim construction as the sole inventor of the patent-at-issue. Waggett knew of Stoll's designation. Sanctions Hr'g Tr. at 83-84.

Haase testified that in the fall of 2005, he purchased an accused Pearl River DADMAC.[6] *Id*. at 142-143. Haase contacted Waggett about having this product tested to determine, *inter alia*, its molecular weight and viscosity. *Id*. at 83-84. On November 9, 2005, Haase sent Waggett an email entitled "MW [molecular weight] Determination of HMW [high molecular weight] DADMAC by GPC [gel permeation chromatography]" in which Haase stated:

> Per our discussions, the subject has become a challenge. The reason for this is that the industry has pretty well gone to molecular weight determination by activity and viscosity. This is so because activity and viscosity are so much easier, cheaper and quicker to perform; and because, once a molecular weight correlation has been determined for a specific polymer molecular moiety, determination of molecular weight by activity and viscosity is reliable and accurate.

Defs.' Exh. 1065.

Waggett testified that although he and Haase knew that Stoll would be initially testifying as a claim construction expert, Stoll was contacted to "help out" with the testing. Sanctions Hr'g Tr. at 85. Stoll testified that Haase contacted him to find a testing lab. *Id*. at 30. Stoll researched

---

[6] ClearValue purchased this product through an intermediary because Pearl River had stopped selling its products to ClearValue. Sanctions Hr'g Tr. at 146. Pearl River had obtained a state court judgment against ClearValue for unpaid invoices.

testing laboratories and emailed Haase and Waggett the same evening attaching a brochure from Lark Labs. Defs.' Exh. 1064 (November 9, 2005 email from Stoll to Haase and Waggett). Stoll stated in the email, "[i]f you want me to co-ordinate this analysis I will be happy to do so." *Id.*

Haase emailed Stoll the next day—November 10, 2005. In the email Haase stated, "[a]s *Gordon [Waggett] and I have discussed*, we would like for you to co-ordinate the testing." Defs.' Exh. 1066 (emphasis added). Haase directed Stoll to have four tests run on the Pearl River product: gel permeation chromatography ("GPC") molecular weight, activity, viscosity, and sulfate ion content. *Id.* Each of these tests related to a patent claim construction issue or trade secret claim in the ongoing litigation.

 Haase met with Stoll in person[7] and gave Stoll two samples of the Pearl River product. Sanctions Hr'g Tr. at 31. Stoll sent the material to Lark Laboratories for testing. *Id.* Lark received the material on November 17, 2005, and on November 28, 2005[8] emailed Stoll its report. Defs.' Exhs. 1067, 1072.

Stoll forwarded Haase the emailed report along with a message briefly summarizing the testing results:

> I am attaching the Lark report. The molecular weights are not as described in the [Pearl River sales] literature but they seem to be consistent with what we saw with the "string test" you ran. I told you that I too thought that the viscosity seemed low and the [molecular weight] seems to confirm that indication. From my reading of the first document they sent and other things I reviewed here, the [molecular weight] is fairly close to the [molecular weight] determined by viscosity methods.

Defs.' Exh. 1072 (November 28, 2005 email from Stoll to Haase). Thus, the email addresses the tested Pearl River product in terms of whether it was covered by the viscosity-driven claim

---

[7] The date of this meeting was unspecified but the evidence shows that it took place between the 9th and 17th of November, 2005. *See* Defs.' Exhs. 1066, 1067.

[8] The Lark report contained the GPC molecular weight testing. Lark subcontracted with Texas Oil Tech to perform the viscosity, percent solids, and sulfate by ion chromatography testing. *See* Defs.' Exh. 1068. The Texas Oil Tech testing was completed on December 13, 2005. *Id.* Stoll testified that he received the Texas Oil Tech report in December of 2005. Sanctions Hr'g Tr. at 45.

construction of molecular weight that ClearValue was arguing for in its claim construction briefing. Stoll also stated that they could "talk about these results tomorrow at [litigation counsel's] office."[9] *Id*.

Two days later on November 30, 2005, Haase was deposed as the sole inventor of the '690 patent on claim construction. Docket No. 290. Waggett and Stoll were present at that deposition. *Id*. Haase was questioned extensively about the meaning of the terms molecular weight and high molecular weight ammonium polymer[10] as presented in Stoll's statement of anticipated claim construction testimony. *See* Docket No. 38.

Haase responded to Stoll's November 28, 2005 email on December 1, 2005 and copied Waggett. Defs.' Exh. 1072. Haase stated "[a]s *we reviewed the reports*, I agree that there have been some changes to the product by Pearl River." *Id*. (emphasis added). Haase also stated that, "I was informed by Mr. David Breslin [that] the bulk viscosity of the sample was near 1400 cps. Such a bulk viscosity still fits the peak indicating a significant portion of the sample having a molecular weight of over 1.3M."[11] *Id*. This statement shows that Haase was attempting to craft an argument that the accused product still infringed the '690 patent—despite the Lark GPC results—by speculating that the product's 1400 cps viscosity indicated that a "significant portion" of the sample was high molecular weight. *See id*. Haase's attempt to use the Lark report to bolster his patent

---

[9] There is no indication in the record that ClearValue's previous or current litigation attorneys were aware of the discoverability of the testing in 2005. Stoll testified that he did not discuss the molecular weight test with litigation counsel. Sanctions Hr'g Tr. at 39. ClearValue's prior litigation counsel withdrew in June of 2006, and ClearValue retained new litigation counsel in August of 2006.

[10] Haase testified in his claim construction deposition about the high molecular weight of Calgon's E-1372 product. Docket No. 290 at 75-79. Haase testified at the sanctions hearing that Pearl River had represented to ClearValue prior to the suit that Pearl River's 4820 product had molecular weight as high as the Calgon product. *See* Sanctions Hr'g Tr. at 143.

[11] David Breslin purchased Pearl River products for ClearValue. Sanctions Hr'g Tr. at 146. The December 13, 2005 Texas Oil Tech report discussed below shows Breslin was mistaken; the accused product's viscosity was less than 600 cps. Defs.' Exh. 1068.

infringement suit—or at least his attempt to explain away the Lark test's results—is further outlined in the email:

> while Pearl River plays with the manufacturing to obtain some type of average [molecular weight] of less than [one million], there are still significant components which are over [one million molecular weight]. Further, such fits the bulk viscosity parameters *as taught in the '690 and the '849* (which we should eventually independently verify).

*Id*. (emphasis added).[12]  This email was sent to Waggett and Stoll early on December 1, 2005—mere hours before Stoll's expert deposition on claim construction was scheduled to begin. Defs.' Exhs. 1072, 1077. This email chain included Stoll's November 28, 2005 email to Haase and Lark's email to Stoll. Defs.' Exh. 1072. Therefore Waggett was fully aware that Stoll had viewed and discussed the Lark report.

Waggett responded to Haase at 7:44 a.m., less than two hours before Stoll's deposition began, stating: "[w]e need that independent verification of viscosity (and the other parameters we discussed) asap.  Also, to *best preserve priv/work product, please keep all of your written communications on this subject directed only to me* (do not copy [Stoll])." Defs.' Exh. 1071 (emphasis added).

Stoll's expert claim construction deposition began at 9:35 a.m.  Both Waggett and Haase were present. Defs.' Exh. 1077 (Stoll Depo. on Claim Construction).  Stoll was questioned at length about molecular weight—both how to define it and testing methods to determine it.  Stoll was also questioned extensively about documents he had reviewed in preparing his expert claim construction statement, but he never mentioned the Lark report.  *See id*. at 7-8.  Stoll testified at the sanctions hearing that ClearValue's focus during the claim construction phase was to convince the Court to adopt a construction that defined molecular weight according to viscosity as opposed to gel

---

[12]  The '849 patent application covers the alleged blending technology ClearValue asserted as a trade secret in this suit.  ClearValue alleged that this technology was a trade secret until patent application was filed in November 2003.

permeation chromatography ("GPC").  Sanctions Hr'g Tr. at 47-48.  Stoll did not mention at his deposition that he had seen a GPC test indicating that an accused Pearl River polymer did not have a high molecular weight; Waggett and Haase both failed to correct this omission.  *See id*.

Texas Oil Tech Labs had performed the viscosity and percent solids testing (which indicated concentration) for Lark Labs.  Defs.' Exh. 1068.  The report was prepared on December 13, 2005 and indicates that it was requested by Stoll.  *Id*.  The results showed that the tested Pearl River product did not have the viscosity described in the '690 patent.  Defs.' Exh. 1068; Sanctions Hr'g Tr. at 103.  The report showed a viscosity of less than 600, well below the 1400 cps Haase discussed in his November 28, 2005 email.  *See* Defs.' Exhs. 1068, 1072.  Haase's and Waggett's testimony clearly indicate that both saw the Texas Oil Tech report.  Sanctions Hr'g Tr. at 103, 170.

Although ClearValue withheld its testing from Pearl River, ClearValue did not provide a privilege log listing either the Lark or Texas Oil Tech reports as claimed work product.  ClearValue did not perform any further tests on any Pearl River product.

The Court held the claim construction hearing on February 9, 2006.  Waggett was present at that hearing.  Arguments for construing the terms "molecular weight," "viscosity," and "average" consumed the bulk of the hearing.  *See* Docket No. 70.

On June 27, 2006, ClearValue's then-current litigation attorneys filed a motion to withdraw, claiming irreconcilable differences with ClearValue and Haase, leaving Waggett as ClearValue's sole counsel of record.  *See* Docket No. 87.  On July 17, 2006, the Court issued its claim construction opinion.  The Court construed molecular weight as the "sum of the atomic weights of all the atoms in a molecule as measured by [an accepted method]."  Docket No. 89.  This definition included molecular weight as determined by either GPC or viscosity.

On August 8, 2006, Nicholas Patton appeared on behalf of ClearValue as its new lead trial

counsel.  Docket No. 92.  On August 28, 2006 the Court granted the pending motion to withdraw by ClearValue's prior litigation attorneys.  Docket No. 101.  In addition, Geoffrey Culbertson appeared on behalf of ClearValue on August 31, 2006, and Patricia Peden appeared for ClearValue[13] on March 19, 2007.  Docket Nos. 104, 262.

On September 29, 2006, Waggett submitted ClearValue's expert rebuttal reports, including Stoll's report.  Docket No. 121.  The Lark and Texas Oil Tech tests were not produced in connection with this report.

On November 6, 2006, ClearValue filed a motion for modification of the claim construction opinion for four terms that included "molecular weight."  Docket No. 140.  ClearValue's motion sought modification of definitions relating to high molecular weight DADMAC.  *See id*.  The motion included Pearl River documents and deposition testimony of a Pearl River employee regarding the molecular weight of 4620 and 4820, but did not include any mention of the Lark or Texas Oil Tech reports.  ClearValue's motion was granted in part, but the Court did not modify the construction of "molecular weight."  Docket No. 255.

On December 28, 2006, Pearl River sent its third set of interrogatories and request for production.  The first interrogatory asked ClearValue to "[i]dentify any report, measurements, or result of molecular weight testing conducted by Plaintiffs on any type of product or chemical compound . . . manufactured by each Defendant."  On January 29, 2007, ClearValue objected to the first interrogatory as "seeking to discover work product and trial preparation materials that are not discoverable under the Federal Rules."  Defs.' Exh. 1070.  Waggett testified that Culbertson submitted this response based on Waggett's assertion to Culbertson that previously ran tests were

---

[15] Again, there is no indication that Patton, Culbertson, or Peden had any knowledge that the 2005 testing had been improperly withheld until it was discovered by Pearl River during trial.

protected work product.  Sanctions Hr'g Tr. at 93-94.  ClearValue never produced a privilege log

in conjunction with this claim of work product or otherwise described the reports as required under

Rule 26(b)(5)(A).

Also in January of 2007, Haase created a business plan for ClearValue.  Defs.' Exh. 1008

(ClearValue January 2007 business plan).  The business plan stated that Waggett was "ClearValue's

corporate counsel and is planned to be ClearValue's corporate secretary."  *Id*. at 18.  The business

plan also claimed that the total financial value of Pearl River's infringement of ClearValue's patents

and patent applications—including the '690 patent and the blending technology covered in the '849

patent application—"is estimated between $100M and $500M."  *Id*.

On March 23, 2007, ClearValue filed notice of intent to assert at trial only claims 1, 9, 10,

and 17 of the '690 patent—each of which described a clarification process using a "high molecular

weight" DADMAC.  Docket No. 268 (Plaintiffs' Notice of Intent); '690 Patent col. 16:27-30; 16:64-

67; 17:12-15; 18:13-17.

Trial began on March 26, 2007.  Haase testified on the first and second days of the trial.  On

the second day, Pearl River asked Haase if he had "taken any samples of Pearl River products to an

independent lab and had it tested for molecular weight."  Haase responded, "I believe *a person* on

the team has.  And I don't know if that's attorney/client or if I should talk about that.  I don't know

what to do here."  Trial Tr. March 27, 2007 at 52-53 (emphasis added).  The Court—sustaining

ClearValue's objection based on attorney/client privilege—instructed Haase to answer the question

to the extent it did not involve confidential communications.[14]  *Id*.  Haase testified that he had seen

the test results and that the testing was done "around the time" suit was filed.  *Id*.  Pearl River then

---

[14]  Although not specifically noted, most of the testimony during the first three days of trial relating to the unproduced
tests was heard by the Court outside the presence of the jury, as were many of the related rulings.  The one-day
sanctions hearing was conducted entirely outside the presence of the jury.

sought production of the testing, and Waggett asserted that the "tests are work product." *Id*. The Court ruled that Haase's limited testimony regarding the test results was insufficient to waive the asserted work product privilege. *Id*. at 57.

On the third day of trial—March 28, 2007—Stoll was asked during cross-examination if he has seen molecular weight testing of Pearl River products other than those conducted by Pearl River's expert. Waggett again objected to the question on the basis of work product. Trial Tr. March 28, 2007 at 180-81. Pearl River argued that ClearValue waived their work product if a testifying expert looked at the material. *Id.* at 181. Waggett argued first that the Stoll was "not relying on that molecular weight report whatsoever"—an argument that the Court rejected. *Id*. at 183. Waggett also argued that Stoll did not review the report in his capacity as a testifying expert, stating that Stoll's review "was independent of any—any commission for his expert consulting or testifying in this case"—presumably meaning that the attorney work product privilege was preserved. *Id*. at 184. The Court ruled that the work product privilege was waived "to the extent [ClearValue] allowed a testifying witness to review [the test]." Stoll proceeded to testify that he had seen a molecular weight test of a Pearl River product other than the test results conducted by Pearl River. Trial Tr. March 28, 2007 at 180. Stoll's and Haase's testimony confirmed that Haase had given Stoll a sample of an accused Pearl River product for testing. *Id*. at 210-11. The Court ordered ClearValue to produce the report and any related documents by 8:00 p.m. that evening and stated it would consider any motion for sanctions by Pearl River the next morning. *Id*. at 212.

After Pearl River received the missing reports, it filed a motion for dismissal of all claims and for sanctions the evening of March 28, 2007. Docket No. 282. The next morning, the Court excused the jury for the day and held an all-day hearing on sanctions. Waggett, Stoll, and Haase each testified regarding their roles in the Lark and Texas Oil Tech testing. Neither Waggett, Haase,

ClearValue, nor any of ClearValue's litigation counsel requested a continuance to prepare a response to Pearl River's sanctions motion.

By the end of the hearing, the full background of the suppressed report was revealed.  The Court held that "this was not a valid privileged [document], there was no basis for withholding it, that I can see, other than [an] intentional, willful, and bad faith effort to keep damaging testimony . . . from the Defendants right up until the very last moment during the trial."  Sanctions Hr'g Tr. at 190.  The Court determined the misconduct was "egregious" and "extremely prejudicial" to Pearl River at the late stage in the case and that drastic sanctions were appropriate: "I cannot think of any sanctions that would be appropriate in this case, other than the ultimate sanction, which I am going to impose, of striking the Plaintiffs' pleadings and entering a judgment against the Plaintiff[s] and in favor of the Defendant[s]."  *Id.*  Pearl River was also awarded attorneys' fees and expenses, and the Court ordered appropriate briefing within 15 days and allowed 10 days for a response.  *Id*. at 191.

## APPLICABLE LAW

A. Discovery Requirements

*1) Rule 26*

Rule 26 imposes affirmative disclosure duties upon parties.  In addition to requiring broad initial disclosures, Rule 26 directs parties to disclose expert testimony and the basis for expert opinions:

> disclosure [of an expert's identity] shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case . . .  be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; [and] the data or other information considered by the witness in forming the opinions.

FED. R. CIV. P. 26(a)(2)(B).  Furthermore, parties have a duty to supplement their disclosures under

Rule 26, including expert reports and prior responses to written discovery requests.[15]  Finally, a party

claiming privilege for an otherwise discoverable document "shall make the claim expressly and shall

describe the nature of the documents, communications, or things not produced or disclosed in a

manner that, without revealing information itself privileged or protected, will enable other parties

to assess the applicability of the privilege or protection."  FED. R. CIV. P. 26(b)(5)(A).

*2) Discovery Order*

Paragraph 2 of the Court's April 6, 2005 Discovery Order directed the parties to disclose

relevant documents without awaiting a discovery request.  *See* Docket No. 9 at 2.  Local Rule CV-

26(d) provides specific guidance to parties and attorneys in evaluating whether evidence is "relevant

to the claim or defense of any party" and is therefore discoverable:

> (1) It includes information that would not support the disclosing parties' contentions; (2) It includes
> those persons who, if their potential testimony were known, might reasonably be expected to be
> deposed or called as a witness by any of the parties; (3) It is information that is likely to have an
> influence on or affect the outcome of a claim or defense; (4) It is information that deserves to be
> considered in the preparation, evaluation or trial of a claim or defense; and (5) It is information that
> reasonable and competent counsel would consider reasonably necessary to prepare, evaluate or try a
> claim or defense.

The Discovery Order also specifically directed ClearValue and Haase to disclose information shared

with their testifying expert witnesses.  Paragraph 3(4)(a) ordered each party to disclose to the other

---

[15]  Rule 26(e) states:

> A party who has made a disclosure under subdivision (a) or responded to a request for discovery with a
> disclosure or response is under a duty to supplement or correct the disclosure or response to include
> information thereafter acquired if ordered by the court or in the following circumstances:
>
> > (1) A party is under a duty to supplement at appropriate intervals its disclosures under subdivision
> > (a) if the party learns that in some material respect the information disclosed is incomplete or
> > incorrect and if the additional or corrective information has not otherwise been made known to the
> > other parties during the discovery process or in writing. With respect to testimony of an expert
> > from whom a report is required under subdivision (a)(2)(B) the duty extends both to information
> > contained in the report and to information provided through a deposition of the expert, and any
> > additions or other changes to this information shall be disclosed by the time the party's disclosures
> > under Rule 26(a)(3) are due.
> >
> > (2) A party is under a duty seasonably to amend a prior response to an interrogatory, request for
> > production, or request for admission if the party learns that the response is in some material respect
> > incomplete or incorrect and if the additional or corrective information has not otherwise been
> > made known to the other parties during the discovery process or in writing.

FED. R. CIV. P. 26(e).

"all documents, tangible things, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony."  Docket No. 9 at 3. Furthermore, the parties were ordered to supplement their discovery in paragraph 10:

> [a]fter disclosure is made pursuant to this order, each party is under a duty to supplement or correct its disclosures immediately if the party obtains information on the basis of which it knows that the information disclosed was either incomplete or incorrect when made, or is no longer complete or true.

*Id*. at 4.

B. Sanction Authority

*1) Rule 37*

Federal Rule of Civil Procedure 37(c) authorizes sanctions against a party who fails to make disclosure or cooperate in discovery:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence . . . any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under Rule 37(b)(2)(A), (B), and (C) and may include informing the jury of the failure to make the disclosure.

FED. R. CIV. P. 37(c).  These sanctions may include "an order striking out pleadings or parts thereof, dismissing an action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party."  FED. R. CIV. P. 37(b)(2)(C); *see Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980).  Rule 37 also directs awarding expenses—including attorneys' fees—in many cases:

> In lieu of [other enumerated sanctions] or in addition thereto, the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

FED. R. CIV. P. 37(b)(2) (emphasis added).  "Rule 37 sanctions must be applied diligently both 'to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent.'"  *Roadway Express, Inc.,* 447

U.S. at 764 (quoting *Nat. Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976)).

Rule 37(b)(2) requires that any sanction be just and that the sanction be related to the particular claim that was at issue in the order to provide discovery. *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 413 (5th Cir. 2004) (citations omitted) (affirming the sanction of finding of alter ego imposed as a result of party's discovery misconduct related to the alter ego issue).   Further, the severe sanction of a default judgment for a discovery violation may only be imposed where the penalized party's discovery violation is willful and where lesser sanctions would not substantially achieve the desired deterrent effect. *United States v. $49,000 Currency*, 330 F.3d 371, 376 (5th Cir. 2003).   Factors in determining whether a party's failure to comply with a valid discovery order merits severe sanctions include

> whether failure to comply resulted from wilfulness or bad faith, and not from inability to comply, whether deterrent value of Federal Civil Rule 37 cannot be substantially achieved by use of less drastic sanctions, whether [the] opposing party's preparation for trial was substantially prejudiced, and whether neglect was plainly attributable to attorney, rather than blameless client, or when [a] party's simple negligence was grounded in confusion or sincere misunderstanding of court's order.

*Batson v. Neal Spelce Assoc., Inc.*, 765 F.2d 511, 514 (5th Cir. 1985).   "District courts, before dismissing actions with prejudice for failure to comply with valid discovery orders, should make express findings concerning whether less drastic sanctions would equally serve punishment and deterrent aspects of [Rule 37]." *Id.* at 516.   District courts "may also consider whether the discovery violation prejudiced the opposing party's preparation for trial, and whether the client was blameless in the violation." *United States v. $49,000 Currency*, 330 F.3d at 376.

Attorneys' fees may also be awarded under Rule 37.   "Like the dismissal sanction, the assessment of attorney's fees is penal in nature; it is designed to penalize those who engage in the charged conduct and to deter others who might be tempted to follow in similar conduct." *Id.* at 516 (quoting *Roadway Express*, 447 U.S. at 763-64).   "The plain language of Rule 37, however, provides

18

that only those expenses, including fees, caused by the failure to comply may be assessed against the noncomplying party.  Furthermore, the expenses must be reasonable." *Id*.

*2) Rule 26*

Federal Rule of Civil Procedure 26(g)(3) authorizes appropriate sanctions for discovery certifications that are made without substantial justification:

> If without substantial justification a certification is made in violation of the rule, the court . . . shall impose upon the person who made the certification, the party on whose behalf the disclosure, request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee.

FED. R. CIV. P. 26(g)(3).  Courts have imposed sanctions under Rule 26(g) against parties or attorneys who have made misrepresentations about discovery.  *See Pope v. Fed. Express Corp.*, 138 F.R.D. 684 (W.D. Mo. 1991) (sanctioning attorney who claimed an obviously falsified document was genuine); *Perkins v. Gilbert/Robinson, Inc*., 821 F.2d 686 (D.C. Cir. 1987) (sanctioning attorney who misled the court about a client's completion of discovery requests); *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543 (N.D. Cal. 1987) (sanctioning attorney who falsely represented that the client had made an adequate search for requested documents).

*3) Inherent Authority*

This Court also has the inherent power to sanction parties, and this inherent power is not limited to sanction  mechanisms created by statute or rule.  *See Chambers v. NASCO Inc.*, 501 U.S. 32, 42-43 (1991).  The Court's inherent powers are those that "are necessary to the exercise of all others."  *Roadway Express*, 447 U.S. at 764.  Inherent powers include the Court's power to control its docket by dismissing a case as a sanction for a party's failure to obey court orders.  *Gonzalez v. Trinity Marine Group, Inc*., 117 F.3d 894, 898 (5th Cir. 1997).  However, when inherent powers are invoked they must be exercised with "restraint and discretion."  *Id.*  Thus, severe sanctions should

be confined to instances of "bad faith or willful abuse of the judicial process." *Id*. The severe sanction of dismissal is within the Court's discretion; "[c]onsequently, the 'less severe sanction' of an assessment of attorney's fees is undoubtedly within a court's inherent power as well." *Chambers*, 501 U.S. at 45.

Although a court usually imposes sanctions under statutes or rules, sanctions imposed under a court's inherent powers are appropriate in egregious cases of bad faith conduct such that in the informed discretion of the court, neither the statute nor the rules are up to the task." *Id*. at 32. In any event, when parties exploit the judicial process, a court may sanction conduct beyond the reach of other rules. *Natural Gas Pipeline v. Energy Gathering, Inc*., 2 F.3d 1397, 1407 (5th Cir. 1993).

## ANALYSIS

### A. ClearValue, Haase, and Waggett Improperly Withheld the Tests

*1) ClearValue, Haase, and Waggett were required to disclose the tests*

The Lark and Texas Oil Tech reports were related to ClearValue's patent claims and analogous trade secret water clarification process claims. Proving Pearl River's accused products had a "high molecular weight" as defined in the '690 patent was a necessary and key component of ClearValue's patent infringement case. Each of the asserted '690 patent claims required the use of a high molecular weight DADMAC. *See* Docket No. 268 (Plaintiffs' Notice of Intent to Assert Only Claims 1, 9, 10, and 17); '690 Patent col. 16:27-30; 16:64-67; 17:12-15; 18:13-17. ClearValue also had to show that the accused products had specific viscosity characteristics to prove infringement of the asserted '690 patent claims because the term "high molecular weight quaternized ammonium polymer" was construed to include the viscosity. *See* Docket Nos. 89, 255.

Molecular weight was also an important element of ClearValue's purported blending trade secrets. These alleged blending trade secrets—i.e., pH balancing and reaction quenching using HCl,

and use of sodium persulfate—were primarily geared toward creating stable blends of *high molecular weight* DADMACs and one or more other chemicals such as ACH and Epi-DMA. *See* Docket No. 178 at 2.

The Lark report pertained to the molecular weight of one of the accused products; the Texas Oil Tech report pertained to the viscosity and concentration of the same product. The reports measured whether the accused product had the molecular weight and viscosity characteristics of the "newly formulated" class of "high molecular weight quaternized ammonium polymers" described in the '690 patent. *See* '690 Pat. col. 1:7-17; 3:1-4. Both tests are therefore unmistakably relevant to this case. The tests became discoverable once ClearValue's testifying expert had reviewed them. *See* Discovery Order at ¶ 3(4)(a) (Docket No. 9 at 3).

*2) Haase's and Waggett's proffered reasons for withholding the reports are not credible*

Despite their litigious history, ClearValue was still getting its chemical supplies from Pearl River through a third party since Pearl River refused to do business with ClearValue. Haase testified that the Pearl River product was tested because it was "off-spec"—i.e., not performing as expected at a ClearValue customer site in Arkansas—and the testing was not related or relevant to the ongoing litigation.[16] Trial Tr. March 28, 2007 at 210-11. Haase testified that he suspected the material did not have the high molecular weight or viscosity characteristics he alleged it should have as an accused product. *Id*.

Haase's assertions regarding customer issues are without support. The Court ruled the tests admissible on the third day of trial after Stoll testified that he had reviewed the tests; the Court then put ClearValue, Haase, and Waggett on notice that the Court would hear any motions for sanctions

---

[16] Stoll also testified that Haase told him this was the reason for the testing, although Stoll did not have personal knowledge of the alleged customer site problem. Trial Tr. March 28, 2007 at 210.

the next day.  Yet Haase, ClearValue, and Waggett failed to produce a single document at the sanctions hearing to support Haase's story that the testing was performed solely to investigate a product performance issue for a customer site.  Nor were any such supporting documents or third-party affidavits included in any of ClearValue's or Waggett's subsequent briefing regarding reconsideration of the sanctions.

Further, none of the November and December 2005 emails reference any customer site performance issue.  What they do contain are discussions about whether the material's characteristics were still somehow consistent with being a high molecular weight DADMAC in spite of the Lark test results.  The Lark molecular weight GPC test was run shortly before ClearValue argued claim construction at the *Markman* hearing.  The Lark GPC test showed that the Pearl River product did not have a high molecular weight as defined by the '690 patent.  Had the GPC test confirmed a molecular weight of a million or more, the report would no doubt have been produced.

Haase's and Waggett's arguments that the reports were irrelevant are incredible.  These reports were highly material; the molecular weights of Pearl River's accused products were critical in determining whether the asserted claims were infringed and viscosity was also an issue in the case.  Haase's and Waggett's assertions that the tests are unimportant are especially lacking in credibility; Haase and Waggett both alternately claimed that the reports meant nothing, and then argued that the reports actually supported their case.  Sanctions Hr'g Tr. at 124-25, 164.  Yet when the Court asked Haase why the reports were not produced and presented during claim construction arguments if they were helpful, Haase unconvincingly stated, "I don't know.  You'll have to ask my legal team."  Sanctions Hr'g Tr. at 164.  Haase also asserted that he remembered telling his litigation counsel that "the test would help the case" when litigation counsel told him that the tests were going to be withheld as attorney work product.  *Id*. at 171-72.  Given Haase's record of aggressively

22

pursuing legal action to protect his perceived legal rights,[17] and his active involvement in this litigation, it is unbelievable that Haase would have allowed his counsel to withhold favorable evidence. The evidence instead supports the conclusion that Haase wanted to conceal the reports because he knew they were damaging to his case.

Haase's assertions that the Lark and Texas Oil Tech reports are not relevant to the molecular weight of the accused products are utterly unconvincing. Haase testified at the sanctions hearing that Pearl River had verbally represented to him that 4820 was a high molecular weight polymer. Sanctions Hr'g Tr. at 143. These allegations are directly contradicted by Pearl River's evidence regarding molecular weight. *See* Docket No. 240 Exh. 3. Pearl River markets its products based on viscosity, but not molecular weight. Pearl River's documents contained conflicting information on the molecular weight of the accused products. Pearl River had an expert report prepared to discuss an independent test of the accused products' molecular weights. The expert report indicated that the accused products do not have high molecular weights. Haase argues that Pearl River's molecular weight testing is not reliable because the independent laboratory did not also test viscosity to verify the known viscosity properties. Because Pearl River labels the viscosities of the accused products—but not the molecular weights—Haase claims that there is no way to verify that the independent molecular weight tests were performed on the correct products. Haase also asserted that the product he tested was an improperly manufactured sample of an accused product. Therefore, to accept Haase's version of events, one would have to believe that Pearl River shipped Hasse's supplier an incorrect or improperly manufactured product *and* that Pearl River sent their

---

[17] The record is replete with evidence of other patent infringement suits filed by Haase on behalf of ClearValue against ClearValue's former customers, competitors' customers, and competitors, as well as distributors and municipalities that allegedly infringed the '690 patent. Most of these suits were non-suited by ClearValue or dismissed for want of prosecution.

expert incorrect products or substituted materials for molecular weight testing.  Haase even goes so far as to insinuate that Pearl River purposefully sent low-molecular weight substitutes to its expert for independent testing.  Haase's convoluted, conspiracy-theory version of events is not credible. The Lark report is consistent with Pearl River's expert report, which shows that the accused products are not high molecular weight.

Waggett's testimony was also contradictory on the relevance issue.  He alternatively argued that the tests meant "nothing to the case," and that the tests were "completely consistent with the case."  Sanctions Hr'g Tr. at 124-25.  When the Court asked why Waggett objected to producing the reports if they were helpful to his clients' case, Waggett's answer was unclear.[18]  When the Court asked the question again, Waggett's second response was no more convincing than his first: "I wasn't thinking about the merits of that piece of evidence whatsoever when the objection was being made."  Sanctions Hr'g Tr. at 125.  The Lark molecular weight test was a proverbial smoking-gun document, and Waggett's testimony that he did not take the molecular weight report's importance into account is unconvincing.

Finally, Waggett admitted that his work product privilege claims were improper but claimed that he did not realize that the claims were improper when he made them.  *See* Sanctions Hr'g Tr. at 89-108, 112, 123, 126.  Waggett's claims of mistake or oversight are not credible. Waggett testified that he understood that the work product privilege protects documents prepared "in connection with litigation."  Sanctions Hr'g Tr. at 110-11.  This is inconsistent with his testimony that the testing related to a non-litigation business matter at a ClearValue customer site. Waggett's testimony shows he could not have believed that the work product privilege applies to a document he knew was not prepared in anticipation of litigation.

---

[18] Waggett responded: "[b]ecause I wasn't present in my—I didn't even remember what it was."  Sanctions Hr'g Tr. at 125.

Waggett's testimony that he had a "disconnect" with Stoll's involvement in the testing and Stoll's role as an expert in this case is also not credible. *See* Sanctions Hr'g Tr. at 112-13. Haase's November 28, 2005 email to Waggett and Waggett's reply to that email clearly demonstrate first that Waggett knew that Stoll had viewed the Lark report and discussed its implications for this suit with Haase and second, that Waggett did understand that sharing information with Stoll could waive any privileges because Waggett specifically instructed Haase "to best preserve priv/*work product*, please keep all of your written communications on this subject directed only to me (*do not copy [Stoll]*)." Defs.' Exh. 1071 (emphasis added).

Further, the very next day after Stoll's deposition, Waggett deposed Pearl River's claim construction expert and asked what materials the expert had reviewed, demonstrating his understanding that materials viewed by a testifying expert are discoverable and not privileged. *See* Docket No. 59 Exh. C at 8 (Barron Depo. on Claim Construction); *see also* Sanctions Hr'g Tr. at 112. Waggett's conduct and communications are inconsistent with his later claims of confusion regarding the work product doctrine. *See* Sanctions Hr'g Tr. at 90, 91, 93, 96, 97, 107-08, 123. The evidence instead supports the conclusion that Waggett asserted numerous false claims of work product privilege to deliberately conceal the tests.

Finally, Waggett's proffered reasons of having a great deal of work to do in this litigation, being "rusty" or "not understanding" the work-product doctrine, failing to fully analyze the work product issue, and believing that the initial disclosures satisfied all discovery obligations are not legitimate excuses.[19]

---

[19]   Waggett also admitted twice during the sanctions hearing that the claims of work product were improper. Sanctions Hr'g Tr. at 96, 101.

3) *ClearValue's litigation counsel did not engage in any misconduct*

Pearl River did not seek sanctions against any of ClearValue's litigation attorneys,[20] and this Court sees no basis for imposing any such sanctions *sua sponte*. There is no indication that any of ClearValue's attorneys besides Waggett had any knowledge of the improper withholding of the reports. Stoll testified that he never discussed the reports with Waggett or ClearValue's litigation counsel. Sanctions Hr'g Tr. at 39. There is no evidence that ClearValue's previous litigation counsel—who withdrew after the *Markman* hearing—knew about the testing.[21] Likewise, ClearValue's litigation counsel at the time of trial—Patton, Culbertson, and Peden—were unaware of the improper concealment. They relied on Waggett's assertion that the reports were work product. Their reliance was not unreasonable given that Waggett had personal knowledge of the reports-at-issue, the reports were prepared before the other attorneys were hired, and Waggett had been heavily involved in this litigation from its inception. Waggett testified that the improper concealment was not attributable to ClearValue's litigation counsel, and Pearl River's counsel emphatically stated on the record that the evidence showed that ClearValue's remaining counsel were totally innocent of this misconduct. Sanctions Hr'g Tr. at 93, 182. Accordingly, there is absolutely no evidence that ClearValue's litigation counsel did anything improper, unethical, unprofessional, or lacking integrity.

## B. ClearValue, Haase, and Waggett Committed Sanctionable Misconduct

By refusing to produce the reports, ClearValue, Haase, and Waggett violated Rule 26 and this Court's Discovery Order. It is clear that the failure to produce these reports was an ongoing act

---

[20] Pearl River also withdrew its motion for sanctions against Stoll.

[21] Haase paid for the testing, not ClearValue's litigation counsel. Sanctions Hr'g Tr. at 87.

of willful concealment, not a mistake of inadvertence.  These were not tests that ClearValue, Haase, and Waggett did not realize existed.  Haase and Waggett were personally responsible for having these tests done almost a year *after* the case was filed.  The Court's Discovery Order was clear regarding the discoverable nature of materials reviewed by a testifying expert, and the failure to produce the reports did not stem from a misunderstanding of the Rules or the Discovery Order.  The tests were required to be produced under Rule 26, the Discovery Order, and Pearl River's Third Request for Admission.

The work product privilege does not protect these reports—regardless of why they were performed.  Even if the Court were to believe Haase's unsupported assertions that the testing was done for business purposes,[22] the results would be discoverable because they are relevant (indeed, the molecular weight testing went to the heart of the litigation) and *not* prepared in anticipation of litigation.  The evidence instead supports the conclusion that the reports were prepared in connection with *this* litigation and not to investigate an undocumented issue at a customer site.  Furthermore, the reports lost any work product protection they may have had the moment Stoll received them.  The reports were therefore discoverable and Haase, ClearValue, and Waggett violated their affirmative, ongoing duty to produce and supplement discovery.  Waggett admitted numerous times that there was no work product privilege for the tests.  Sanctions Hr'g Tr. at 91, 93, 104.

Failure to disclose the tests was not a one-time mistake or oversight.  These reports were concealed for more than a year and a half and were not produced despite ClearValue and Haase's ongoing discovery obligations as defined in the Discovery Order, the explicit discovery requirements regarding testifying experts, Pearl River's specific requests for production a month

---

[22]  Again, neither Waggett, Haase, nor ClearValue offered a single document or third-party affidavit in their sanctions-related pleadings to lend credence to the customer problem scenario they alleged.

before trial, and even during Haase's and Stoll's testimony at trial.

It is appropriate to sanction Haase individually. Haase was actively involved in the prosecution of this litigation. Haase was the sole inventor named in the patent-at-issue. Haase testified as the sole inventor in support of ClearValue's claim constructions. Haase also testified at trial about the patent. In light of his technical expertise and prior testimony regarding high molecular weight, Haase cannot claim that he did not understand the relevance of the Lark testing. In fact, Haase reviewed the Lark molecular weight tests mere days before giving his claim construction deposition.

Haase's conflicting testimony supports an inference of both his knowledge of the importance of the testing and a willful, bad faith suppression of the results. Haase's testimony continuously changed under questioning. First, when asked if ClearValue had tested a Pearl River Product, he evasively replied that "a person on the team has." Trial Tr. March 27, 2007 at 52-53. Prior to the sanctions hearing, Haase also testified unequivocally that he had not reviewed the tests with his attorneys. Trial Tr. March 28, 2007 at 212. This testimony is belied by the emails Waggett produced later that day, which include detailed discussions of the results shared between Haase, Stoll, and Waggett. Haase admitted his own involvement and Waggett's knowledge only after the relevant emails and tests were produced by others. Next, Haase claimed that the tests were performed to resolve a business matter, but then frankly admitted that he would have produced the tests had the results favored his case. *See* Sanctions Hr'g Tr. at 150-51, 170. Haase then asserted that the tests actually bolstered ClearValue's claims and that he would have produced them if not for his attorneys' advice to withhold the tests as work product. *Id*. at 171-72.

Haase is the sole named inventor of the patent-at-issue, testified on claim construction issues, testified at trial extensively about technical issues including molecular weight, was aware of Pearl

28

River's discovery requests, prepared his own affidavits, and even wrote arguments for this litigation. His involvement in this litigation shows that he understood the critical relevance of the withheld tests and his obligation to produce the tests. Haase was deposed on claim construction issues, attended other depositions, attended hearings, helped draft responsive arguments on technical issues, and even prepared an affidavit on molecular weight. *See* Sanctions Hr'g Tr. at 119-20, 136, 141, 155-56. Haase therefore had numerous opportunities to produce the tests before Waggett made the first assertion of work product privilege.

Haase and ClearValue are inseparable for purposes of this litigation. Both are plaintiffs in this case. Haase is the founder and CEO of ClearValue, and makes all of ClearValue's business decisions. Haase wrote ClearValue's business plan. Haase directs all litigation on behalf of ClearValue; he gathered discovery for production, drafted responses to summary judgment motions, has prepared his own declarations, and is a highly involved client. Haase essentially *is* ClearValue for the purposes of this trial. Therefore, it is appropriate to sanction ClearValue based on Haase's actions.

The evidence shows that Waggett was also active in suppressing this report. Waggett knew about the tests—he helped Haase plan them and Waggett admitted that he involved Stoll. Sanctions Hr'g Tr. at 97, 108. Waggett knew that Stoll coordinated the tests and discussed the molecular weight GPC results with Haase. *See* Defs.' Exh. 1072. Yet Waggett did not supplement ClearValue's discovery as he was affirmatively obligated to do under the Rules and the Discovery Order. Waggett has represented ClearValue and Haase since the outset of this case and knows that these tests are extremely relevant, if not case-dispositive. *See* Sanctions Hr'g Tr. at 96. Waggett did not inform ClearValue's litigation counsel that the tests even existed until mere weeks before trial when Pearl River specifically requested any tests ClearValue performed on any Pearl River

product.  Waggett then mislead litigation counsel by falsely asserting the work product privilege for

the tests.  Although litigation counsel Culbertson prepared the response to Pearl River's request for

testing, Waggett testified that he told Culbertson that the tests—which were prepared over a year

before Culbertson first appeared in this case, were privileged work product.[23]

Furthermore, Waggett was the only attorney for ClearValue and Haase who had seen the

tests and consequently was the only attorney who could have prepared the required privilege log.

Waggett failed to submit any privilege log, thereby concealing the tests' importance and frustrating

Pearl River's right to understand and challenge the privilege claim.  *See* Fed. R. Civ. P. 26.  Finally,

Waggett falsely claimed the work product privilege twice more during trial.

Waggett, ClearValue, and Haase willfully abused the judicial process and their conduct in

this case constitutes or is tantamount to bad faith.  *See Roadway Express*, 447 U.S. 752.  The

discrepancies throughout Haase's and Waggett's testimony cannot be accounted for by innocent

lapses in memory.  The only logical explanation for their glaring inconsistences is that Haase and

Waggett were being deceptive in an attempt to cover-up their improper concealment of the test

results.

## C. Pearl River was Severely Prejudiced

Haase, ClearValue, and Waggett engaged in a willful, bad faith concealment of highly

relevant, discoverable information from Pearl River which severely prejudiced Pearl River.  Pearl

River was entitled to the Lark report prior to Stoll's claim construction deposition and to the Texas

Oil Tech report after Stoll received it in December 2005.  The ongoing concealment of these

documents impacted Pearl River's ability to defend this suit in depositions regarding claim

construction and technical matters, in preparing and arguing summary judgment motions, in

---

[23]  Again, there is no evidence that Culbertson ever even saw the tests, but relied upon Waggett in responding to the
request for production.

developing its trial strategy, and in possible settlement negotiations.

This concealment was extremely prejudicial to Pearl River because the tests were relevant to a central and vehemently-contested issue in the case, the reports were concealed for over a year-and-a-half while Pearl River continued to incur huge expenses in defending the suit, and the reports only came to light in the midst of trial, and even then over Waggett and Haase's clearly baseless efforts to conceal the reports as work product.

## D. Severe Sanctions are Warranted

Sanctions are appropriate if they are sufficient to deter similar future conduct. Even though the Lark and Texas Oil Tech reports were eventually produced, they were only produced once Haase's and Waggett's deception was revealed. ClearValue did not voluntarily produce these materials; and even voluntary production would only potentially mitigate against, but not prevent, the application of sanctions. *See Metropolitan Life Ins. Co. v. Estate of Cammon*, 929 F.2d 1406 (9th Cir. 1991).

Proving that Pearl River's accused products have a high molecular weight as defined by the '690 patent was an indispensable element of ClearValue's case. ClearValue, Haase, and Waggett purposefully suppressed discoverable evidence that was highly relevant to this critical issue, which was heavily argued at the claim construction hearing, and was a major issue and focus of questioning at trial. Plaintiffs argue that the test results were not relevant because they were not certain that the Pearl River product tested was actually an accused product. They miss the point of discovery obligations entirely; a party may not withhold discoverable information because he or she does not like or agree with the information. ClearValue and Waggett were free to argue about what the Lark and Texas Oil Tech reports did or did not show; they were *not* free to withhold the reports after their testifying expert reviewed them.

31

Here, the severest sanctions are warranted. ClearValue's and Waggett's arguments that severe sanctions should not be imposed because they were denied an opportunity to be heard are meritless. The Court conducted a six hour hearing on this matter, and ClearValue, Haase, and Waggett were given a full opportunity to present evidence and argument. ClearValue and Haase were represented by three other attorneys at the hearing besides Waggett and neither Waggett nor Plaintiffs' other counsel requested a continuance to prepare for the hearing. They have therefore waived the argument that they were given insufficient notice of the hearing.

The Court has considered the parties' arguments and pleadings regarding sanctions, the evidence presented at the hearing and at trial, and the record in its entirety and finds that severe sanctions are warranted. *See Chambers*, 501 U.S. at 42-43; *Batson,* 765 F.2d 511. First, the failure to comply with the Discovery Order and Rules resulted from willfulness and bad faith, not from any inability to comply. Haase and Waggett did not claim that they misunderstood the Federal Rules or the Discovery Order, which clearly directed the parties to disclose "all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony." Docket No. 9. Haase's and Waggett's failure to produce these reports was an affirmative attempt to suppress damaging evidence.

Second, Pearl River's prejudice cannot be mitigated, much less cured, this far into trial. Pearl River was entitled to the reports on November 28, 2005. Trial in this case began on March 26, 2007. The reports would no doubt have impacted every aspect of Pearl River's preparation during this year-and-a-half period because the reports were relevant to a central issue in the case.[24]

---

[24] Some Pearl River documents indicated that the accused products were high molecular weight while other Pearl River documents indicated that the products were not. Pearl River's independent tests also indicated that the accused products were not high molecular weight. ClearValue and Haase's position at trial was that the documents indicating a high molecular weight were trustworthy, while the conflicting evidence was not. This strategy would have been greatly damaged, if not destroyed, by the reports-at-issue because they would have undermined

Had the reports been produced earlier, Pearl River would not have been so severely prejudiced.[25] Instead, the reports came to light in the midst of trial, when ClearValue and Haase had almost finished presenting their case.

Third, lesser sanctions in this case would not substantially achieve the deterrent value of Rule 37. Haase and Waggett knew of the reports and chose to conceal them, even going so far as to make an improper claim of work product privilege to keep the reports from Pearl River. ClearValue, Haase, and Waggett's refusal to follow the Court's Order and their active obstruction of Pearl River's discovery is further aggravated by the fact that ClearValue and Haase garnered the benefit of this Court's rigorously enforced discovery rules when they chose to file suit here. Any sanction for this egregious misconduct—short of ultimate sanctions—would only encourage litigants to take their chances and conceal damaging, discoverable information.

Finally, the failure to comply was not plainly attributable to Waggett. *See Batson*, 765 F.2d at 514. Haase is a sophisticated party who was very involved in prosecuting this case on behalf of ClearValue and himself. Haase's inconsistent testimony regarding the testing supports an inference that he knew the tests were damaging to his case. Haase's misrepresentation to this Court that he had not shared the report with his counsel was clearly contradicted by the evidence. This misrepresentation, together with the other inconsistencies regarding the value of the reports (first that the reports showed nothing useful, then asserting that the reports actually supported his case), supports the inference that Haase is not a blameless client, but an active party to the concealment.

---

ClearValue and Haase's position at trial and credibility with the jury, just as it has with this Court.

[25] Pearl River may not have had to defend against this suit at all after November 2005 because this suit was taken on contingency by ClearValue and Haase's litigation attorneys and therefore was not financed by ClearValue, Haase, or Waggett. Sanctions Hr'g Tr. at 101, 138. ClearValue's previous litigation attorneys may well have withdrawn their support for this case had this damaging evidence been shared with them. ClearValue's new litigation counsel may well have declined to take this case had they known of these reports. Finally, Pearl River may well have won on summary judgment.

Haase's argument that his claims should not be stricken or dismissed because Waggett improperly claimed work product are not convincing. First, Haase willfully violated the Court's Discovery Order by not producing the reports. Haase testified that he gathered responsive documents in this litigation; therefore he had direct knowledge of the required scope of discovery in this Court. Furthermore, the Discovery Order clearly sets forth the scope of discovery relating to testifying experts. Haase knew Stoll was a testifying expert and that Stoll had reviewed the reports. Haase and Stoll in fact discussed the Lark report's impact on the litigation. Haase therefore knew the report was discoverable and concealed the report for a year before Waggett made any claim of work product privilege. Haase has put forth no evidence that Waggett told him that the report was protected work product. In fact, Waggett's email to Haase directing Haase to not share information with Stoll to "preserve privilege" implies that Haase was aware that sharing information with Stoll would destroy privilege. Haase's failure to follow the Court's Discovery Order was neither a result of simple negligence nor a sincere misunderstanding of the order.

## E. Lesser Sanctions are not Sufficient

Lesser sanctions are not appropriate in this case. First, an instruction to the jury that they may regard testimony as less credible is not sufficient because it does not punish Plaintiffs for their active concealment of the relevant information. It would not remedy the prejudice to Pearl River; Pearl River was forced by ClearValue and Waggett to prepare and defend against a set of facts manufactured by ClearValue's and Waggett's willful concealment of the reports. Any jury instruction sanction would be insufficient to redress Pearl River's prejudice. Second, a continuance would not have been practicable because trial was well under way when the misconduct was discovered, and a short continuance would have been insufficient to allow Pearl River to adapt its trial presentation. Third, ordering a new trial would not compensate Pearl River for the year-and-a-

34

half of prejudice to its case, nor compensate it for the millions of dollars Pearl River has already spent defending against this suit. Fourth, monetary sanctions alone would not be sufficient in light of the reports' importance and the likely impact they would have had on pre-trial litigation and negotiations. Rather, a new trial would increase Pearl River's costs in defending this suit.

Finally, allowing ClearValue to go forward on only its blending trade secrets claims would not be an appropriate lesser sanction.[26] The blending trade secret claims were secondary in this suit and inextricably linked to the water clarification process patent and trade secret claims. The alleged blending trade secrets dealt primarily with different aspects of creating a stable blend of *high molecular weight* DADMAC and one or more other chemicals. The futility of attempting to parse out the blending trade secrets claims from the water clarification process claims is underscored by ClearValue's own expert damages report and testimony, which failed to allege the value of the blending trade secrets apart from the water clarification process claims. *See Weisberg v. Webster*, 749 F.2d 864 (D.C. Cir. 1984) (upholding dismissal of all of a plaintiff's claims even though the discovery misconduct at issue was unrelated to some of them).

Striking Haase and ClearValue's pleadings regarding patent infringement and water clarification process trade secrets—while harsh—is warranted in this case. Any lesser sanction that would allow ClearValue and Haase to go forward with their dubious lawsuit would not adequately punish Plaintiffs and Waggett for their misconduct or adequately compensate Pearl River for the effort and expense it has been unnecessarily put to. Any lesser sanction or combination of lesser sanctions would reward Plaintiffs and Waggett for their misconduct and would encourage others to engage in similar misconduct. *See Computer Assocs. Int'l Inc. v. Am. Fundware, Inc*., 133 F.R.D.

---

[26] ClearValue and Haase withdrew their unfair competition claims during trial, leaving only the patent and trade secret misappropriation claims.

166 (D. Colo. 1990) (striking pleadings in case where party's willful misconduct seriously prejudiced other party and misconduct could not be punished or deterred with lesser sanctions).

Monetary sanctions are also appropriate in this case under the Federal Rules and this Court's inherent powers. *See Roadway Express*, 447 U.S. 752; FED. R. CIV. P. 26, 37. There was no substantial justification for the failure to disclose these reports. *See* FED. R. CIV. P. 26(g). These reports were directly relevant to a central issue in this case and were highly damaging to ClearValue's case. *See Compaq Computer Corp.*, 387 F.3d at 412 (affirming award of attorneys' fees against party for discovery abuse). These reports were so damaging, in fact, that this suit would likely not have continued after November 28, 2005 had the reports been produced. Therefore it is appropriate to award monetary sanctions equal to the attorneys' fees and actual costs[27] incurred by Pearl River between November 29, 2005 and the date this Order issues, inclusive. Haase, ClearValue, and Waggett are jointly and severably liable for these monetary sanctions. This discovery violation is an egregious case of bad faith conduct and these sanctions against Haase, ClearValue, and Waggett are appropriate in light of their abuse of the judicial process. *See Roadway Express*, 447 U.S. 752; *Natural Gas Pipeline*, 2 F.3d at 1407 (holding that a court has the inherent authority to impose sanctions greater than those provided for in the Federal Rules); *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440 (11th Cir. 1985) (affirming monetary sanction against attorney found to have acted in bad faith during discovery); *Kleiner v. First Nat. Bank*, 751 F.2d 1193 (11th Cir. 1985) (affirming large monetary sanction imposed on counsel under the court's inherent powers).

## CONCLUSION

Under Rule 37 and the Court's inherent power, the Court **STRIKES** ClearValue and Haase's

---

[27] As a sanction against ClearValue, Haase, and Waggett, Pearl River may recover all of its actual costs incurred, not merely those available to a prevailing party under 28 U.S.C. § 1920. In light of ClearValue's and Waggett's exploitation of the judicial process, a monetary sanction beyond the reach § 1920 and Rule 37 is appropriate. *See Chambers*, 501 U.S. at 35; *Natural Gas Pipeline*, 2 F.3d at 1407.

pleadings—including their pleadings responding to Pearl River's counterclaim of patent invalidity—and **ENTERS JUDGMENT FOR** Pearl River and against ClearValue and Haase. ClearValue, Haase, and Waggett are **ORDERED** to pay Pearl River's costs and attorneys' fees incurred in this litigation between November 29, 2005 and the date this Order issues, inclusive. Pearl River is **ORDERED** to file a notice of these costs within 10 days of the issuance of this Order, which will be included in the final judgment to be entered in this case.   Accordingly, Pearl River's Motion for Dismissal of All Claims and for Sanctions (Docket No. 282) is **GRANTED**, and ClearValue and Hasse's Motion to Reconsider Sanctions and for New Trial (Docket No. 286) and Waggett's Motion for Reconsideration of Sanctions (Docket No. 294) are **DENIED.**  Waggett appeared *pro hac vice* in this litigation, and the Clerk of Court is **ORDERED** to initiate proceedings to prevent Gordon Waggett from being admitted *pro hac vice* in the Eastern District of Texas in the future.

This ruling makes clear to attorneys and parties in the Eastern District of Texas that they must understand and comply with this Court's discovery rules and their discovery obligations. *See Bratka v. Anheuser-Busch Co.*, 164 F.R.D. 448 (S.D. Ohio 1995) ("If litigants are to have any faith in the discovery process, they must know that parties cannot fail to produce highly relevant documents within their possession with impunity.  Parties cannot be permitted to jeopardize the integrity of the discovery process . . .").  Civil litigation in this country is conducted on an honor system.  Only in rare circumstances can a party force its way into an opposing party's corporate offices and root through its documents unfettered.  Rather, each party is responsible for conducting its own search of its own documents and turning over all of the relevant, non-privileged documents. Each side must trust that the other has not withheld or destroyed the proverbial smoking gun.  When one side intentionally violates this honor code, it damages not only the opposing party but the legal

37

profession as a whole and the entire system of civil justice.

**So ORDERED and SIGNED this 28th day of June, 2007.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**